**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

CASE NO.: _____

FILED BY _____ D.C.

DEC 26 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**UNITED STATES OF AMERICA and STATE**
**OF FLORIDA *ex rel.* ELIAS KRANIDIS**

       **Plaintiffs,**

**v.**

**SUNSHINE STATE HEALTH PLAN INC.,**
**CENTENE MANAGEMENT COMPANY, LLC,**
**and CENTENE CORPORATION**

       **Defendants.**

_____/

**FILED IN CAMERA AND**
**UNDER SEAL PURSUANT TO**
**31 U.S.C. §3730(b)(2)**

**DO NOT POST TO PACER**

## *QUI TAM* COMPLAINT AND DEMAND FOR JURY TRIAL

This is an action brought by Plaintiff/Relator Elias Kranidis ("Relator") on behalf of the

United States of America and the State of Florida pursuant to the Federal False Claims Act, 31

U.S.C. § 3729, and the Florida False Claims Act, Fla. Stat. § 68.083.

### INTRODUCTION

1.     The State of Florida entrusted Defendant Sunshine State Health Plan, Inc.

("Sunshine"), a wholly-owned subsidiary of Centene Corp. ("Centene"), with the oversight and

administration of the healthcare for nearly 500,000 of the State's most vulnerable citizens when

it contracted with Sunshine under the Statewide Medicaid Managed Care ("SMMC") program.

2.     In preparation for this critical undertaking and to ensure its smooth execution,

officials from the Florida Agency for Health Care Administration ("AHCA") met with

representatives from Sunshine on numerous occasions over several months.

3.     AHCA and Sunshine ironed out every detail of how to provide healthcare to Florida's citizens, ranging from how AHCA would communicate with Sunshine to identify enrollees and the structure of data files, to when communications would be sent between the parties. The procedures were memorialized in a detailed contract and series of attachments and related exhibits.

4.     The services that Sunshine contracted to provide are so vital to the health and wellbeing of Floridians that the parties agreed that Sunshine would have as little as one hour to notify AHCA of problems in the execution of the agreed-upon services.  Sunshine further agreed to pay significant sanctions and liquidated damages should it fail to fulfill its obligations.

5.     Yet, when faced with technical difficulties that resulted in the improper denial of Medicaid benefits and managed healthcare services to more than 20,000 Floridians for several months, Sunshine, at the direction of Centene and with the assistance of Centene Management Company LLC ("CMC"), deliberately concealed the problem from the government, submitted false statements expressly attesting that the company was providing the agreed-upon services, and requested and received more than $13 million for healthcare services that it never provided to tens of thousands of Florida's most vulnerable citizens.

6.     Sunshine committed this fraud to avoid millions of dollars in sanctions and liquidated damages, and to deprive the State of Florida of its ability to enforce other contractual rights, such as reassigning beneficiaries to other health plans.

7.     Indeed, Sunshine was well aware of the teeth that the contract provides to AHCA, as AHCA imposed more than $6.7 million in sanctions and liquidated damages against Sunshine in FY17-18, nearly double that of any other AHCA Managed Medicaid Organization ("MMO") in the same time period.  The significant penalty caused panic at Sunshine's parent company,

2

Centene, and prompted the organization to convene focus groups that met regularly to try to determine ways to avoid future sanctions.

8.     Feeling the sting of the recent sanctions, Sunshine, Centene, and CMC conspired to conceal their bad acts and, in the process, jeopardized the health of tens of thousands of Florida's most vulnerable citizens to boost their profits.

## JURISDICTION AND VENUE

9.     This action arises under the Federal False Claims Act, 31 U.S.C. § 3729-3733 *et seq.* and the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, 28 U.S.C. § 1367, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730. Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as an action brought under 31 U.S.C. § 3730.

11.     This Court has personal jurisdiction over Sunshine pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process because Sunshine can be found in, resides in, transacts business in, and has committed the alleged acts in Broward County, which is in the Southern District of Florida.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Sunshine can be found in, resides in, and transacts business in the Southern District of Florida, and alleged acts occurred in this District.

13.     Relator knows of no other complaints that have been filed against Defendants alleging the same or similar allegations. Relator is an original source as defined by the Federal False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and the Florida False Claims Act, Fla. Stat. §

3

68.087(3)(c), and as described more fully herein. Relator has made voluntary disclosures to the United States and the State of Florida as required by each False Claims Act.

## PARTIES

14.     Relator Elias Kranidis is a resident of Hudson, Florida, and began working for Sunshine in 2013 as the Manager of Eligibility and Enrollment. In this position, Relator oversaw thirty-five to forty Eligibility Specialists and Enrollment Processors who handled eligibility and enrollment for more than 45,000 Long-Term Care members. Relator's team worked with Case Management to assist with the Coordination of Care and helped resolve issues relating to provider claims.

15.     Defendant Sunshine State Health Plan, Inc. is a Florida Corporation with a principal place of business located at 1301 International Parkway, Suite 400, Sunrise, FL 33323. Sunshine provides a wide variety of managed care services across the state through the Florida SMMC program.

16.     Defendant Centene Corp. is the parent company of Sunshine and conducts substantial business in Florida through its subsidiaries, including Sunshine. Centene's principal place of business is located at 7700 Forsythe Blvd, St. Louis, MO 63105.

17.     Defendant Centene Management Company, LLC is a subsidiary of Centene and was contracted by Sunshine to provide various services on Sunshine's AHCA contracts relating to the events at issue in this lawsuit including management information systems, claims adjudication platforms, business continuity planning and disaster recovery, federal compliance, fraud waste and abuse and special investigations, and financial services support. CMC's principal place of business is located at 7700 Forsythe Blvd, St. Louis, MO 63105.

4

## REGULATORY OVERVIEW

### MEDICAID

18.     Medicaid was established by Title XIX of the Social Security Act of 1965, 42

U.S.C. § 1396-1396v. Medicaid is a jointly funded federal-state program and enables states such

as Florida to provide medical assistance to persons whose income and resources are insufficient

to meet the costs of necessary medical services.

19.     The Social Security Act provides for open-ended federal matching for a state's

Medicaid program.  The amount varies year to year based on a program called the Federal

Medical Assistance Percentage ("FMAP") and a state-specific multiplier.  For example, in

Florida, the applicable FMAP for fiscal years 2017 through 2019 were:

| Fiscal Year | Federal Share | State Share |
| --- | --- | --- |
| 2017 | 61.10% | 38.90% |
| 2018 | 61.79% | 38.21% |
| 2019 | 60.87% | 39.13% |

20.     The federal government has authorized states to enter into contracts with managed

care organizations ("MCOs") with adequate access standards to provide healthcare services to

Medicaid members.  Under these contracts, the MCO is paid a predetermined payment per

member per month for covered healthcare services.  The monthly payment is referred to as a

"capitation payment."  The capitation rate is based on actuarial studies that factor in age, gender,

and health risk of the population, as well as the MCOs' cost assumptions, among other factors.

21.     The capitation rate calculation relies upon the MCOs providing accurate claims

and administrative data. To ensure accurate rates, the states require each MCO by contract to

certify that the data is correct.  Florida Medicaid requires MCOs to spend a fixed amount of their

capitation rates on benefits, and remit any excess pretax profits to Medicaid.

5

## FLORIDA MANAGED MEDICAID

22.     In 2006, Florida launched a managed care demonstration program called the Florida Medicaid Pilot, formerly known as the Florida Medicaid Reform.  The program launched first in two counties and then was expanded to a total of five counties in 2007.

23.     Sunshine first contracted with the state of Florida in 2009 under the Florida Medicaid Pilot program, and the company has played an integral role in the widespread growth of managed care in Florida ever since.

24.     In 2011, Florida enacted the Medicaid Managed Care Act ("MMC Act"), codified at Fla. Stat. §§ 409.961 through 409.985.  The MMC Act modified Florida's Medicaid program by fully converting from a fee-for-service structure into a statewide managed care program for all Medicaid covered services.

25.     Under the MMC Act, Florida's Medicaid program is managed by AHCA.  *See* Fla. Stat. § 409.963.

26.     Pursuant to the MMC Act, the State is divided into eleven "Regions."  *See* Fla. Stat. § 409.966(2).

27.     The MMC Act requires AHCA to implement managed care for Florida's Medicaid program through competitive solicitations in which contracts are awarded to "Eligible Plans."  An Eligible Plan is statutorily defined to include MCOs of various types.  See Fla. Stat. §§ 409.962 and 409.966.

28.     In June 2013, the federal government approved AHCA's request to move nearly all Medicaid beneficiaries and services into managed care, starting in 2014 on a phased-in schedule.  Under this program, managed care enrollment is mandatory.

6

29.     The first component of the expanded managed Medicaid was the Long-Term Care

("LTC") Managed Care program, which expanded the managed Long-Term Services and

Supports/Nursing Home Diversion program. This component was rolled out in phases across the

Regions between August 2013 and March 2014.

30.     The second component, Managed Medicaid Assistance ("MMA"), expanded from

an initial five-county pilot program into a statewide managed care program, and was phased in

from May 1, 2014, to August 1, 2014.

31.     By August 2014, AHCA also transitioned approximately 600,000 beneficiaries

from an older system called MediPass into MMA.

## FACTUAL ALLEGATIONS

### SUNSHINE BIDS FOR AND WINS NEW SMMC SERVICES CONTRACT

32.     On July 14, 2017, AHCA, pursuant to Fla. Stat. § 287.057(1)(c), issued separate

invitations to negotiate ("ITNs") seeking proposals for MMA and LTC services for each

statutorily identified Region for the years 2018 to 2023. The ITNs sought proposals for the

following types of health plans:

- Comprehensive LTC Plan – a managed care plan that is eligible to provide MMA services and LTC services to eligible recipients;

- LTC Plus Plan – a managed care plan that is eligible to provide MMA services and LTC services to eligible recipients enrolled in the LTC program. This plan type is not available to provide services to recipients who are only eligible for MMA services;

7

- MMA only – a managed care plan that is eligible to provide MMA services to eligible recipients. This plan type is not eligible to provide services to recipients who are eligible for LTC services; and

- Specialty Plans – a managed care plan that serves recipients enrolled in Medicaid who meet specified criteria based on age, medical condition, or diagnosis; various health plans submitted responses to the ITN in the areas of Children with Special Needs, Child Welfare, HIV/AIDS, and Serious Mental Illness.

33.    AHCA identified the ITNs for each of the eleven Regions as solicitation numbers AHCA ITN 01-17/18 Region 1, ACHA ITN 02-17/18 Region 2, ACHA ITN 03-17/18 Region 3, *et seq.*

34.    AHCA issued two addenda to the ITNs and made specific revisions, as well as answered more than 600 questions posed by various interested parties, including the MCOs vying for the contracts.

35.    Sunshine responded to the ITNs for all eleven Regions on November 1, 2017, via separate Transmittal Letters.  At the time that Sunshine submitted its ITN responses, it served over 538,000 Medicaid members and a total of 755,000 managed care members throughout Florida. Under its largest contract, Sunshine received more than $3.59 billion from ACHA on an annual basis.

36.    Indeed, Sunshine was well versed in the requirements of AHCA and the SMMC, as it wrote in Exhibit A-4-a to its Transmittal Letter response to each of the ITNs: "Sunshine Health understands that a smooth implementation followed by a well-monitored stabilization period is essential to the overall success of the program in the eyes of members, providers, and

8

other stakeholders." The statement continues, "Sunshine Health has not missed any implementation readiness milestone set by the Agency in its previous implementations."

37.     AHCA ranked the ITN respondents for each Region and invited the top four organizations in each Region to engage in further negotiations.

38.     AHCA selected Sunshine as a top contender and invited Sunshine to negotiate for each of the eleven Regions.

39.     Following many months of negotiations and the exchange of multiple draft contracts, AHCA awarded Sunshine ACHA Contract No. FP060 ("Contract") to provide SMMC services (referred to as Managed Care Plans in the Contract) in all eleven Regions, with a maximum value of $14,739,247,736.36. Under the Contract, Sunshine would provide services from approximately October 1, 2018, through September 30, 2023.

40.     According to the Contract, as described in more detail below, on a daily basis, AHCA sends Sunshine an electronic file with lists of Medicaid enrollees. Sunshine then has a specific time period to process that list and certain fixed time periods in which to provide various services related to enrollment and care management.

41.     Sunshine submits periodic reports to AHCA, covering everything from details about medical and prescription claims to the number of healthcare providers available to serve enrollees. AHCA uses Sunshine's reports to adjust capitation rates and other payments to Sunshine.

42.     Sunshine is obligated to quickly report any problems, disenrollments, or other issues to AHCA.

43.     After reconciling its enrollment data with that reported by Sunshine, AHCA, at

the end of each month, automatically sends a payment and document describing the allocation of

the payment to Sunshine.

## SUNSHINE FAILED TO PROPERLY PROCESS ENROLLMENT FILES AND WRONGFULLY DENIED BENEFITS TO TENS OF THOUSANDS OF FLORIDA MEDICAID ENROLLEES

44.     AHCA launched the new SMMC program in three phases.  Phase One, covering

Regions nine through eleven, launched on December 1, 2018.  Phase Two, covering Regions five

through eight, launched on January 1, 2019.  Phase Three, covering the remaining Regions, one

through four, launched on February 1, 2019.

45.     Shortly after the launch of Phase One, which covered the counties of Indian

River, Martin, Okeechobee, Palm Beach, St. Lucie, Broward, Miami-Dade, and Monroe,

program managers and case managers at Sunshine began noticing problems with LTC enrollees.

Sunshine's policy administration system, called TruCare, improperly reflected valid Medicaid

LTC enrollees as "void."

46.     On December 5, 2018, Consuelo Suarez ("Ms. Suarez"), a Case Management

Supervisor for Sunshine, emailed Mayra Botello-Infanzon ("Ms. Botello-Infanzon") Sunshine's

Director of Case Management, and copied several others in the LTC and Eligibility departments:

"Verification of benefits on 12/5/18 state SH [Sunshine Health] for LTC, however, member

appears ineligible in TC [TruCare], could you please advise? Is this a glitch?" Included on the

email was an internal distribution list, LCT_Sunshine_ELGSA4@centene.com, which is an

internal list of Centene and Sunshine staff from directors to support level personnel related to

LTC services.

10

47.    On the morning of December 6, 2018, Melissa Saffold ("Ms. Saffold"), an

Eligibility Specialist Lead, responded to Ms. Saurez: "Yes, *there has been a known glitch for*

*regions 9/10/11 that affected 6400+ members*. It's a known issue enrollment is aware of, and we

have partnered up and are working to resolve the issue. Please allow 24-48 hours for TruCare to

update" (emphasis added).

48.    Ms. Botello-Infanzon, previously copied on the email, forwarded the email chain

to Relator and others:

> Wanted to reach out to you to brainstorm possible real time
> solutions. The below known issue is affecting LTC compliance with
> auth submission as well as timeliness of service. In addition, the PC
> partner team (LTC phone team under Mark) is receiving member
> calls but the PC are stating member is not active based on what TC
> reflects. Are you available tot [sic] to discuss this today?

49.    Natasha Furlonge, Sunshine's Senior Manager of Enrollment ("Ms. Furlonge")

responded:

> Thanks for reaching out to me. I have reviewed the email thread and
> would like to add additional detail. There is not a glitch in the system.
> The 6400 members referenced below are not all LTC members. This
> number represents MMA, LTC, and CW [children's welfare
> programs]. What is happening is the State sends a record with a span
> where the start and end date are both 12/1 or sends a record with a
> start date of 12/1 and an end date of 11/30. When this occurs, it is
> considered a void, the system creates an error, and places the member
> in a void pending status. Basically system does not like the start and
> end dates the State has sent. The member's start and end date cannot
> be the same date and the end date cannot occur before the start date.
>
> The Enrollment team has to manually verify the member's eligibility
> using FMMIS. We are down to 5853 members. 4918 are MMA, 841
> are LTC, and 94 are CW. 757 of the 841 LTC members are in regions
> 9, 10, and 11. 1 have attached the LTC members in the void pending
> status.
>
> I have assigned someone to work the LTC records and to complete
> the list today so the records can update Trucare when tonight's
> member load runs.

11

50.     Despite the clear contractual requirements to properly process the enrollment of

Medicaid beneficiaries within twenty-four hours, and to report computer system glitches to

AHCA within as little as one hour, Defendants Sunshine, Centene, and CMC denied the

existence of a system-wide problem.

51.     Ms. Furlonge recruited call center staff to work overtime hours to place the

impacted Medicaid enrollees into a "pending void" status.  Enrollees in "pending void" were

denied care management and healthcare.

52.     For example, in the below TruCare record a Medicaid enrollee is listed as

"member dis-enrolled/voluntary withdraw" and "not eligible" for services according to the

second screen capture.

| Recipient Information | | | | | |
|---|---|---|---|---|---|
| **Recipient ID** | | | **Last Name** | | |
| **Birth Date** | | | **First Name** | | |
| **Medicare** AB | | | **Medicare #** | | |
| **Patient Liability** | | | **Outpatient Dollars Remaining** | $1500.00 | |
| **Home Health Visits Remaining** 60 | | | **ER Visits Remaining** 6 | | |
| **Inpatient Days Remaining** 45 | | | | | |

| Vision Benefit Limits | | | | | |
|---|---|---|---|---|---|
| *** No rows found *** | | | | | |

| General Physician Visits | | | | | |
|---|---|---|---|---|---|
| *** No rows found *** | | | | | |

| Benefit Plan | | | | | |
|---|---|---|---|---|---|
| **Benefit Plan** | | **Effective Date** | **End Date** | | |
| MS : Full Medicaid | | 12/05/2018 | 12/05/2018 | | |

| TPL | | | | | |
|---|---|---|---|---|---|
| **Carrier Name** | **Policy Number** | **Policy Holder** | | **Coverage Type** | **Coverage** |
| HUMANA CLAIMS OFFICE | UNKNOWN | | | IND | MEDICARE SF NEED PLAN |

| Managed Care | | | | |
|---|---|---|---|---|
| **Provider Name** | | **Provider Phone** | **Plan Name** | |
| SUNSHINE STATE HEALTH PLAN INC | | (866)796-0530 | SMMC Long-Term Care (LTCC) | |

| Lock-In | | | | |
|---|---|---|---|---|

12



53. As management struggled to identify and resolve the problems, staff were left wondering how to handle the "pending void" members who were supposed to be receiving their new enrollee materials, undergoing initial face-to-face visits with care managers, and receiving critical care management plans.

54. Management from Sunshine repeatedly met with the management team from its parent company, Centene, and with individuals from CMC, which Sunshine contracted to

provide management information systems, claims adjudication services, and compliance services. Rather than quickly disclose the problems to ACHA as required by the Contract, the companies agreed to keep AHCA in the dark, as the agency launched Phases Two and Three for Regions One through Eight on January 1 and February 1, 2019.

55. With CMC's assistance and at the direction of the management of its parent company, Centene, Sunshine created and submitted to AHCA numerous files that deliberately concealed the severe failures of its computer systems and the fact that it denied services to tens of thousands of Medicaid enrollees.

56. By February 4, 2019, the pending void list grew to 21,816 enrollees. Many of the enrollees affected by the glitch in the Defendants' systems remained in "pending void" status for months, during which time the company received more than $13 million for services that it failed to provide.

## SPECIFIC CONTRACTUAL REQUIREMENTS, SANCTIONS, AND LIQUIDATED DAMAGES

57. Many key provisions of the Contract are found in two attachments to the body of the Contract. Attachment I Scope of Services includes provisions that are unique to this particular Contract. Attachment II Core Contract Provisions and its related Exhibits contain terms that apply to specific types of care plans.

58. The Contract details the requirements for Sunshine's computer systems. For example, Attachment II, Section X. Administration and Management, Subsection D. Information Management Systems provides:

> 1.b. Systems Capacity - The Managed Care Plan's system(s) shall possess capacity sufficient to handle the workload projected for the begin date of implementation of this Contract and shall be scalable and flexible as to be adapted as needed, within negotiated

14

> timeframes, in response to changes in Contract requirements, increases in enrollment estimates, etc.

59.     Attachment II, Section X.D.1.d requires that Sunshine be capable of processing

standardized electronic data transactions:

> HIPAA Compliance - The Managed Care Plan must ensure it meets all federal regulations regarding required standard electronic transactions and standards for privacy and individually identifiable health information as identified in the HIPAA of 1996 and the HITECH Act of 2009 and associated regulations.

60.     The Contract also provides in Attachment II, Section X.D.2.a the following:

> (1) The Managed Care Plan's systems shall conform to the standard transaction code sets specified in this Contract.
>
> (2) The Managed Care Plan's systems shall conform to HIPAA and HITECH standards for data and document management.
>
> (3) The Managed Care Plan shall collaborate with the Agency in the management of standard transaction code sets specific to the Agency. Furthermore, the Managed Care Plan shall collaborate with the Agency in the development and implementation planning of future standard code sets not specific to HIPAA or other federal efforts and shall conform to these standards as stipulated in the plan to implement the standards.

61.     The Contract further requires under Attachment II, Section X.D.3. System and

Data Integration Requirements that:

> (a). Adherence to Standards for Data Exchange
>
> (1) The Managed Care Plan's systems shall be able to transmit, receive and process data in HIPAA-compliant formats.
>
> (2) The Managed Care Plan's systems shall be able to transmit, receive and process data in the Agency-specific formats and/or methods.
>
> (3) The Managed Care Plan's systems shall conform to future federal and/or Agency-specific standards for data exchange, including HIPAA-compliant data formats, within one hundred twenty (120) days of the standard's effective date or, if earlier, the

15

> date stipulated by HHS, CMS, or the Agency. The Managed Care Plan shall partner with the Agency in the management of current and future data exchange formats and methods and in the development and implementation planning of future data exchange methods not specific to HIPAA or other federal effort. Furthermore, the Managed Care Plan shall conform to these standards as stipulated in the Agency agreed-upon plan to implement such standards.

62.     Attachment II, Section X.D.10 specifies that data regarding enrollments should be exchanged through an electronic data interchange ("EDI") system following the American National Standards Institute ("ANSI") X12-834 Enrollment Implementation Format, consistent with the requirements of the Health Insurance Portability and Accountability Act ("HIPAA").

63.     AHCA publishes the details of the standardized EDI and ANSI X12-834 on its Florida Medicaid Web Portal for the Florida Medicaid Management Information System ("FMMIS"), which contains detailed technical guides for Managed Care Plans. Many of the guides can be found here: *https://portal.flmmis.com/FLPublic/Provider_ProviderServices/ Provider_EDI/ Provider_EDI_CompanionGuides/tabId/62/Default.aspx* (Last accessed December 9, 2019).

64.     The X12-834 data file contains 175 separate pieces of data for enrollees, providing personal, demographic, eligibility, and other information that identifies the types of medical services approved for government payment.

65.     The X12-834 files are sent by ACHA to Sunshine daily for each Region, with details of any new enrollees, changes to enrollment, or disenrollment.

66.     According to Attachment II, Section X.h.2, Sunshine must process the enrollment files within twenty-four hours of receipt.

67.     For each X12-834 file received by Sunshine, the company is expected to submit responses to AHCA that verify receipt of the file, confirm the syntax of the file, and

16

acknowledge acceptance of the enrollment data. The responses are known as an Interchange

Acknowledgement or TA1 file, a Functional Acknowledgement or 997 file, and an Unsolicited

Claims Status or 227U file. The details of the X12-834 file responses are specified in the Florida

FMMIS 834 Benefit Enrollment and Maintenance Companion Guide.

68.    In addition to the X12-834 file, on a monthly basis, AHCA sends Sunshine an 834

Audit file for each Region. The 834 Audit contains a full report listing all enrollees and their

current status.

69.    AHCA also sends four additional audit files, called 834R (Reconciliation) files,

during the last week of each month. The 834R files are also detailed in the FMMIS 834 Benefit

Enrollment and Maintenance Companion Guide, which describes them as follows:

- The 834 file reflects the payments for the upcoming month's enrollments appearing on the upcoming month's 820 file.

- The 834R1 file reflects the payments and adjustments for last month's enrollments appearing on the upcoming month's 820 file.

- The 834R2 file reflects the payments and adjustments for enrollments from two months back appearing on the upcoming month's 820 file.

- The 834R3 file reflects the payments and adjustments for enrollments from three months back appearing on the upcoming month's 820 file.

70.    As with the other 834 files, Sunshine sends an EDI response to ACHA verifying

receipt and that it processed each of the 834 Audit and Reconciliation files.

71.    Every month, ACHA remits payment to Sunshine for each Region and transmits

to Sunshine an accompanying ANSI 820 data file, which breaks down how the money should be

allocated for each enrollee based on their capitation rate and days of eligibility within the month.

17

72.    Attachment II, Section X.D.3.c. identifies requirements for data validation:

Data and Report Validity and Completeness. The Managed Care Plan shall institute processes to ensure the validity and completeness of the data, including reports, it submits to the Agency. At the Agency's discretion, the Managed Care Plan shall be subject to general data validity and completeness audits using industry-accepted statistical sampling methods. Data elements that shall be audited include, but are not limited to: enrollee ID, date of service, assigned Medicaid provider ID, category and subcategory (if applicable) of service, diagnosis codes, procedure codes, revenue codes, date of claim processing, and (if and when applicable)

73.    Recognizing that a computer system failure could result in the denial of service to

hundreds of thousands of enrollees, Attachment II, Section X.D.4.d Problem Notification,

requires Sunshine to report system errors in no more than one hour, and provide continuing

updates regarding the resolution of critical problems:

d. Problem Notification

(1) Upon discovery of any problem within its span of control that may jeopardize or is jeopardizing the availability and performance of all systems functions and the availability of information in said systems, including any problems affecting scheduled exchanges of data between the Managed Care Plan and the Agency and/or its agent(s), the Managed Care Plan shall notify the applicable Agency staff via phone, fax, and/or electronic mail within one (1) hour of such discovery. In its notification, the Managed Care Plan shall explain in detail the impact to critical path processes such as enrollment management and claims submission processes.

(2) The Managed Care Plan shall provide to appropriate Agency staff information on system unavailability events, as well as status updates on problem resolution. At a minimum, these updates shall be provided on an hourly basis and made available via electronic mail and/or telephone

74.    Attachment II, Section X.D.4.g of the Contract further enables AHCA to require

Sunshine to submit a Corrective Action Plan ("CAP") relating to any significant failure of its

computer systems:

18

Information Systems CAP. If at any point there is a problem with a critical systems function, at the request of the Agency, the Managed Care Plan shall provide to the Agency full written documentation that includes a CAP that describes how problems with critical systems functions shall be prevented from occurring again. The CAP shall be delivered to the Agency within five (5) business days of the problem's occurrence. Failure to submit a CAP and to show progress in implementing the CAP shall make the Managed Care Plan subject to sanctions, in accordance with Section XIII., Sanctions.

75.     The Contact also details the services to be provided to enrollees in each type of

SMMC plan. For example, the MMA plan, as specified in Attachment II, Exhibit II A – MMA,

requires under Section VI.D.2 that Sunshine contact each new enrollee within sixty days of

enrollment to offer to schedule an initial appointment with a primary care physician to complete

an initial health risk assessment. Sunshine also has thirty days from the date of enrollment to ask

MMA enrollees to authorize the release of their health records from their prior providers to their

new Sunshine provider.

76.     Attachment II, Exhibit II A – MMA, Section VI.D.2.3 a requires Sunshine to

notify all pregnant enrollees of the availability of health screenings and make a referral to a

provider to obtain appropriate healthcare within thirty days of enrollment.

77.     The LTC plans have their own unique requirements. For example, Attachment II,

Exhibit II B – LTC, Section V.B.1.a requires that Sunshine provide enrollees with a new enrollee

packet within five business days after their effective date of enrollment if the enrollee lives

within the community or seven business days if the enrollee is enrolled in a nursing home.

78.     Attachment II, Exhibit II B – LTC, Section VI.E.3 imposes the same five and

seven-day deadlines for initial face-to-face visits with LTC enrollees requiring case management

services.

79.      Attachment II, Exhibit B – LTC, Section VI.E.3.d empowers AHCA to seek
significant sanctions and liquidated damages for delays in providing new enrollee packets and
conducting face-to-face visits: "If the Managed Care Plan fails to comply with the requirements
of this section, the Managed Care Plan may be subject to sanctions pursuant to Section XIII.,
Sanctions, or liquidated damages pursuant to Section XIV., Liquidated Damages, as determined
by the Agency."

80.      Attachment II, Exhibit II B – LTC Section VI.E.6 requires at least monthly
telephone contact with enrollees receiving care coordination/case management, and Section
VI.E.7.a requires follow-up face-to-face meetings at least every ninety days.

81.      Attachment II, Exhibit II-B – LTC, Section XIV Liquidated Damages contains a
table of liquidated damages that are unique to the LTC program, relevant portions of which are
excerpted below.

| Liquidated Damages Issues and Amounts | | |
|---|---|---|
| # | LTC Program Issues | Damages |
| 1 | Failure to comply with the enrollee records documentation requirements pursuant to the Contract. | $1,000 per occurrence. |
| 2 | Failure to comply with the timeframes for developing and approving a plan of care for transitioning or initiating HCBS services as described in the Contract. | $500 per day, per occurrence. |
| 3 | Failure to have a face-to-face contact between the Managed Care Plan case manager and each enrollee at least every ninety days or following a significant change as described in the Contract. | $5,000 per occurrence. |
| 4 | Failure to complete in a timely manner minimum care coordination contacts required for persons transitioned from a nursing facility to a community placement as described in the Contract | $500 per day, per occurrence. |
| 8 | Failure to meet any timeframe regarding care coordination for enrollees as described in the contract. | $250 per day, per occurrence. |

| 9 | Failure to follow-up within fourteen days of initial plan of care development to ensure that services are in place as described in the Contract. | $500 for each occurrence. |
|----|----|----|
| 10 | Failure to provide a copy of the plan of care to each enrollee's PCP and facility-based provider in the timeframes as described in the contract. | $500 per day. |
| 11 | Failure to report enrollees that do not receive any LTC services listed in the approved plan of care for a month, as described in the Contract. | For each enrollee, an amount equal to the capitation rate for the month in which the enrollee did not receive Long-Term Care services. |
| 12 | Failure to send authorizations to all applicable providers for the agreed-upon services within twenty-four hours of the initial face-to-face visit as described in the Contract. | $100 for each occurrence. |

82. Attachment II, Exhibit II-C – Child Welfare Specialty Plan, has the same

requirements as Exhibit II-A – MMA, including the requirement to provide enrollment materials

to new enrollees and develop care management plans in a timely fashion.

83. Attachment II, Exhibit II-C, Section XIV.B specifies additional liquidated

damages applicable to Child Welfare Specialty Plans, including:

| Liquidated Damages Issues and Amounts | | |
|----|----|----|
| # | MMA Program Issues | Damages |
| 1 | Failure to verify specialty population eligibility criteria of an enrolled recipient within the timeframes in the Specialty Plan's policies and procedures. | $150 per day for every day beyond the enrollment date. |
| 2 | Failure to comply with required Specialty Plan policies and procedures subject to Agency approval pursuant to the Contract. | $1,000 per occurrence. |

84. Universal to all of the SMMC plans under the Contract, and contained in Section

Q of the introductory section of the Contract, is Sunshine's obligation to timely return any excess

payments received from AHCA. The Contract states that Sunshine is required:

> To return to the Agency any overpayments due to unearned funds or
> funds disallowed pursuant to the terms of this Contract that were
> disbursed to the Vendor by the Agency. The Vendor shall return any
> overpayment to the Agency within forty (40) calendar days after

> either discovery by the Vendor, its independent auditor, or
> notification by the Agency, of the overpayment.

85.     ACHA dedicates a large section of the Contract to efforts to prevent fraud.

Attachment II, Sections X.F.1 to .4 require Sunshine to create a written fraud and abuse

prevention program, hire a compliance officer, create a Fraud Investigations Unit, and have a

Compliance Plan and an Anti-Fraud Plan.

86.     Attachment II, Section X.F.4.d requires specifically that "all officers, directors,

managers, and employees" undergo training in the Managed Care Plan's anti-fraud provisions.

87.     Attachment II, Section X.F.4.d.15 expressly mandates that all Managed Care

Plans train their employees, subcontractors, and providers about:

> (a) The Federal False Claims Act;
>
> (b) The penalties and administrative remedies for submitting false
> claims and statements;
>
> (c) Whistleblower protections under federal and State law;
>
> (d) The entity's role in preventing and detecting fraud, waste and
> abuse;
>
> (e) Each person's responsibility relating to detection and
> prevention; and
>
> (f) The toll-free State telephone numbers for reporting fraud and
> abuse.

88.     Attachment II, Section XI.3.3 grants Managed Care Plans a sixty-day window to

identify any erroneous payments:

> The Managed Care Plan shall carefully prepare all reports and
> monthly payment requests for submission to the Agency. If after
> preparation and electronic submission, the Managed Care Plan
> discovers an error, including but not limited to errors resulting in
> capitated payments or other payments in excess of amounts
> specified in this Contract, either by the Managed Care Plan or the
> Agency, the Managed Care Plan has sixty (60) days from its

22

> discovery of the error, or sixty (60) days after receipt of notice by the Agency, to correct the error and re-submit accurate reports. Failure to respond within the sixty (60)-day period shall result in a loss of any money due to the Managed Care Plan for such errors and/or sanctions against the Managed Care Plan pursuant to Section XIII., Sanctions.

89.     Attachment II, Section XIII, addresses the repercussions for non-compliance with key contractual provisions. Sunshine agreed that AHCA could impose significant sanctions, including monetary sanctions, and even seize control of the Managed Care Plan and install a temporary management team to rectify serious problems.

90.     The Contract reminds Sunshine of AHCA's statutory authority under Fla. Stat. §§ 409.912(4) and 409.967; Fla. Admin. Code R. 59A-12.0073; 42 C.F.R. Part 481, Subpart I; and Sections 1905(t), 1932, and 1903(m) of the Social Security Act. Under these provisions, AHCA can seek sanctions of up to $20,000 per violation, with a maximum of $250,000 per enforcement action.

91.     Attachment II, Section XIII.A.7 gives Sunshine thirty days to pay monetary sanctions and empowers AHCA to withhold capitation payments to recover any sanctions that have become due under Section XIII.

92.     Attachment II, Section XIII.A.8 grants AHCA the right to terminate the Contract or assign enrollees to other SMMC contracts.

93.     In addition to sanctions, the Contract grants AHCA the right to impose liquidated damages under Attachment II, Section XIV "for failure to meet any aspect of the responsibilities of this Contract and its Exhibits."

94.     Attachment II, Section XIV.B of the Contract includes a table of liquidated damages, relevant portions of which are excerpted below.

| Liquidated Damages Issues and Amounts | | |
|---|---|---|
| # | Core Program Issues | Damages |
| 1 | Failure to respond to an Agency communication within the time prescribed by the Agency as described within this Contract. | $500 for each day beyond the due date until provided to the Agency. |
| 2 | Failure to provide covered services with reasonable promptness | $2,500 per occurrence. |
| 4 | Failure to meet plan readiness goals set by the Agency | $5,000 per occurrence. |
| 11 | Failure to comply with time frames for providing Enrollee Handbooks, I.D. cards and Provider Directories, as required in this Contract. | $5,000 per occurrence. |
| 25 | Failure to provide medically necessary services to enrollees under the age of twenty-one years in accordance with this Contract. | $2,500 per occurrence. |
| 31 | Failure to complete a comprehensive assessment, develop a treatment or service plan or plan of care, or authorize and initiate all services specified in the plan for an enrollee within specified timelines as described in this Contract. | $5,000 per occurrence. |
| 35 | Failure to develop and document a treatment or service plan for an enrollee, that shall be documented in writing as described in this Contract. | $500 per deficient/missing treatment or service plan. |
| 39 | Failure to provide covered services within the timely access standards in this Contract. | $500 per day, per occurrence. |
| 72 | Failure to complete or comply with CAPs as described in this Contract. | $500 per day beginning on the next day after default by the Managed Care Plan. |
| 73 | Failure to provide notice of noncompliance to the Agency within five days or other Contract-specified period of time in accordance with this Contract. | $500 per day beginning on the next day after default by the Managed Care Plan. |
| 104 | Failure to file accurate reports as described in the Contract. | $1,000 per occurrence. |
| 106 | Failure to process enrollment files as specified in the Contract. | $1,000 per occurrence. |
| 121 | Failure by the Managed Care Plan to notify the Agency of problems with systems functions within one hour and/or update hourly until resolved, as described in the Contract | $1,000 per occurrence. |

**SUNSHINE BREACHED NUMEROUS CONTRACT PROVISIONS AND CONSPIRED WITH DEFENDANTS CENTENE AND CMC TO CONCEAL ITS FAILURE FROM THE GOVERNMENT WHILE WRONGFULLY RETAINING MORE THAN $13 MILLION IN CAPITATION PAYMENTS**

95.     With CMC's assistance and at the direction of the management of its parent company, Centene, Sunshine created and submitted to AHCA numerous files that deliberately concealed the severe failures of its computer systems and the fact that it denied services to tens of thousands of Medicaid enrollees. The files containing the false information include the TA1 files and 997 files submitted each day in response to the X12-834 enrollment files during the period from December 1, 2018, to until at least April 30, 2019.

96.     Additionally, Sunshine is required to submit periodic Enrollee Roster reports. An example of such reporting requirement is found at Attachment II, Exhibit II-B – LTC, Section XVI.A.1, which requires that Sunshine submit a monthly Enrollee Roster and Facility Residence Report. Sunshine's altered records included these Enrollee Rosters.

97.     Sunshine also submitted false statements to AHCA attesting to its quarterly Achieved Savings Rebate ("ASR") Financial Reports. The ASR Financial Reports are spreadsheets that contain, among other things, the monthly premium earned on behalf of Medicaid recipients and the number of members enrolled each month.

98.     The ASR Financial Reports are accompanied by a jurat page in a separate PDF file on which Sunshine's CEO, Chris Paterson, must personally attest to the accuracy of the contents of the ASR Financial Reports.

99.     Sunshine is anticipated to make another false report to AHCA when it submits its annual ASR Financial Report at the end of the financial year.

100.     Consistent with the terms of the Contract, Sunshine was aware that AHCA relies upon Sunshine's responses to the 834 files and ASR Financial Reports in calculating its capitation payments and the contents of the monthly 820 file.

101.     Between December 2018 and continuing through at least April 2019, Sunshine, at the direction of Centene and with the assistance of CMC, falsely represented that it managed the healthcare and provided services to 21,686 individuals for approximately 28,617 cumulative months. Relator possesses a full list of the individuals, including their names, Medicaid identification numbers, alleged dates of service, capitation rates, and other pertinent details.

102.     One such individual, identified by their first initial, last initial, and last three digits of the Medicaid identification number is GW566.  GW566 is an LTC enrollee for which Sunshine received $17,261.23 in capitation payments for the period January 2019 to April 2019, while denying services because of its internal computer errors.

103.     Another example is LL659. LL659 was enrolled in the MMA TANF plan for individuals aged between zero and two months. Sunshine received $3,809.84 in capitation payments while denying services during December 2018 and January 2019.

104.     A third example is SM391, another LTC enrollee. Sunshine received $4,087.95 in capitation payments for December 2018 while denying services.

105.     Relator repeatedly expressed concerns about the ongoing "glitch" to his chain of command.

106.     Relator told his managers that the company was failing to meet numerous contractual obligations, ranging from conducting new member orientations to providing any level of care management at all, as well as improperly denying claims.

107. As the months passed, the number of enrollees being denied services by Sunshine

skyrocketed from the initial 6,400 to more than 21,000 as additional Regions went live with the

new SMMC program. Relator escalated his complaints from his direct chain of command to

Centene's Director of Compliance, Joyce Chinock-Somuah ("Ms. Chinock-Somuah").

108. In an email with the subject "Void Pending Sanction Exposure" on February 4,

2019, Relator wrote to Ms. Chinock-Somuah:

> I am writing this out of great concern.
>
> I was under the impression that this information was available to all interested parties but after receiving multiple questions related to the fallout of this issue, I am convinced that all who need to know about this actually do not know.
>
> The issue in question is that our systems are showing an [sic] Pending Void for members who are actually not voided by the state. Our system are [sic] incorrectly showing members voided and in turn, it is restricting the members' access to care. There are currently 21,815 members showing voided in our system who are actually eligible for services.
>
> The liquidated damages for this are $2500 per incident.
>
> This equates to $54,537,500 in total risk to the company.

109. In a follow-up email to Ms. Chinock-Somuah on February 7, 2019, Relator

provided a list of the affected enrollees and cautioned that the company's liability was "quite

higher than I originally estimated." Relator continued:

> There is a **$2500 LD** [liquidated damages] per member for failure to provide covered services with reasonable promptness. In addition, there's a **$5000 LD** per member for failure to comply with time frames for providing Enrollee Handbooks, I.D. cards and Provider Directories.
>
> **Potential Risk is $7500 per member. Today's VOID Pending Report out of UMV (attached) shows 20,711 members which equals $155,332,500 in potential Liquidated Damages!!**

27

> This issue began in early December with about 5000 members potentially affected and now we are over 20,000 potential member [sic] affected.
>
> As I stated on our call, after responding to a call from Pamela VanKoevering about some members showing not eligible in TruCare on Monday February 4, I discovered that no one in The Case Management department had any knowledge of the void pending issue. Pam also told me that no one in MMA Case Management or Contracting knew of this huge risk. She suggested I contact you and report this potential liability to the company.

(Emphasis in original).

110.    The liquidated damages cited by Relator are in addition to the approximately

$13,571,412.72 in capitation payments that Sunshine wrongfully collected and retained from

ACHA through at least April 2019.

111.    In phone calls and emails, Relator told Ms. Chinock-Somuah that the company

should report its problems to state officials at ACHA, and he warned that inaction could result in

even more significant liability for the company.

112.    After Relator disclosed the problems to Ms. Chinock-Somuah in the Compliance

Department, he received an angry phone call from Jose Ramirez ("Mr. Ramirez"), Sunshine's

Director of Operations. Mr. Ramirez told Relator that he should have brought the problem to the

Director of Enrollment, not Compliance.

113.    Mr. Ramirez and other members of management subsequently isolated Relator

and cut him out of conversations and meetings relating to the ongoing problems that directly

affected his ability to perform his job.  Mr. Ramirez then issued Relator a negative performance

evaluation for the first time in his six-year tenure and placed Relator on a Performance

Improvement Plan.

114.    Relator also brought his concerns to Jodi Bruhn ("Ms. Bruhn"), a Senior Manager of Human Resources for Centene. Relator forwarded several of his emails to Ms. Bruhn and described the problems in great detail.

115.    Various persons told Relator that the errors came from the 834 files that AHCA transmitted to Sunshine. Even if that were true, Sunshine should have immediately notified AHCA of the problem, rather than concealing it for months while continuing to collect millions of dollars in capitation payments for tens of thousands of enrollees that weren't enrolled in the program and were denied healthcare.

116.    Relator conferred with individuals that work for other health plans also contracted by AHCA to provide similar services in other Regions. None of them experienced similar problems with the data files transmitted by AHCA, suggesting that Sunshine, not AHCA, made the error.

117.    Ironically, in Exhibit A-4-a to its Transmittal Letter responses to the ITNs, Sunshine asserted to AHCA, "Our culture of compliance extends beyond contractual requirements. If something is missed or requires enhancement, we promptly correct and institute new processes. We are a learning organization focused on adapting and evolving our processes and models to meet the needs of our members, providers and State Partners."

118.    In the same document, Sunshine also touted how it and Centene employ "a best-practice Scaled Agile Framework (SAFe) approach to change management," which allows it to make "rapid, reliable system modifications in large enterprises with complex system needs." Yet, it took Sunshine many months to resolve the system problems that deprived tens of thousands of Medicaid enrollees of their benefits.

119. AHCA relied on Sunshine's various assertions regarding its superior technology and management techniques, as well as the company's contractual agreement that it would be subjected to significant liquidated damages and sanctions for any serious failures when it entrusted the company with providing healthcare for hundreds of thousands of Floridians.

120. Yet, all of those assertions and guarantees were for naught, because when faced with a massive failure of its computer system, Sunshine elected to actively conceal the problems and make material misstatements to continue receiving more than $13 million in capitation payments and to avoid sanctions and liquidated damages that could exceed $100 million.

121. A small sample of relevant liquidated damages applicable to Sunshine's failures concealed from AHCA by Sunshine, CMC, and Centene include the following:

   a. Attachment II, Section XIV.B:

      i. $2,500 per occurrence for each failure to provide covered services with reasonable promptness;

      ii. $5,000 per occurrence for failure to comply with timeframes for providing Enrollee Handbooks, I.D. cards, and Provider Directories, as required by the Contract; and

      iii. $500 per day, per occurrence for failure to provide covered services within the timely access standards in the Contract.

   b. Attachment II, Exhibit II-B – LTC, Section XIV:

      i. $5,000 per occurrence for failure to have face-to-face contact between the Managed Care Plan case manager and each enrollee at least every ninety days or following a significant change as described in the Contract;

ii. $500 per day, per occurrence for failure to meet any timeframe regarding care coordination for enrollees as described in the Contract;

iii. $500 for each occurrence for failure to follow-up within fourteen days of initial care plan development to ensure that the services are in place as described in the Contract; and

iv. A refund of the full capitation rate for failure to report enrollees that do not receive any LTC services listed in the approved plan of care for a month, as described in the Contract.

122.    In sum, Sunshine, Centene, and CMC elected to jeopardize the health of tens of thousands to maximize their profits and to ensure the future of Sunshine's lucrative deal with AHCA.

## COUNT I

### Violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B), (C), and (G)

123.    Relator realleges and incorporates paragraphs 1-122 of this Complaint as if fully set forth herein.

124.    Sunshine, which acts under the direction and control of Centene with the assistance of CMC, which provides, operates, and maintains Sunshine's computer systems, knowingly and/or recklessly submitted numerous false documents to AHCA including: daily TA1 and 997 file responses to the X12-834 enrollment files; periodic responses to the 834 Reconciliation and 834 Audit files; quarterly and annual ASR Financial Reports certified as true by Sunshine's CEO, Chris Patterson; and periodic Enrollment Roster reports.

31

125.   In accordance with the Contract, the various files and reports submitted by Sunshine function as claims for payment of the specified capitation rates for each enrollee identified by AHCA and confirmed by Defendants as receiving services.

126.   AHCA relied upon Defendants' numerous false statements and made at least $13,571,412.72 in capitation payments between December 2018 and May 2019 for 21,816 enrollees who were improperly denied services by Sunshine during between December 2018 and at least through April 2019.

127.   The Contract imposes significant sanctions and liquidated damages for any material breach, and it contains multiple tables with descriptions of specific events and the corresponding obligation that is incurred.

128.   The Contract also requires Sunshine to identify and return any overpayments to AHCA within forty days of discovery. Defendants are likewise subject to the "sixty-day rule" of the Patient Protection and Affordable Care Act.

129.   In accordance with the terms of the Contract, AHCA relies upon the various files and reports submitted by Sunshine to determine what, if any, sanctions or liquidated damages should be imposed upon Sunshine.

130.   Defendants met numerous times and conspired to submit false files, reports, and other statements to ACHA to obtain additional capitation payments and to avoid Sunshine's obligations under the sanctions and liquidated damages provisions of the Contract.

131.   In doing so, Defendants have violated:

   a.   31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

32

b.  31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

c.  31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and/or

d.  31 U.S.C. § 3729(a)(1)(C) by conspiring to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G).

132.    Because of the false or fraudulent claims made by Defendants, the United States has suffered and continues to suffer damages and is therefore entitled to a recovery as provided by the Federal False Claims Act of an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT II

### Retaliation in Violation of the False Claims Act, 31 U.S.C. 3730(h)

133.    Relator realleges and incorporates paragraphs 1-122 of this Complaint as if fully set forth herein.

134.    Relator engaged in several acts to stop what he reasonably believed to be multiple violations of the False Claims Act when he communicated to Mr. Ramirez, Sunshine's Director of Operations; Ms. Chinock-Somuah, Centene's Director of Compliance; members of Sunshine's Human Resources Department; and other individuals his concerns that Sunshine was in breach of its Contract with AHCA and when he advocated for making a voluntary disclosure to AHCA as required by Sunshine's Contract.

135.     Sunshine harassed and discriminated against Relator when Mr. Ramirez called

Relator and berated him for taking his concerns to Ms. Chinock-Somuah. Mr. Ramirez further

discriminated against Relator when he issued Relator a frivolous Performance Improvement Plan

and denigrated Relator's job performance.

136.     Relator is entitled to an amount of damages to be determined at trial.

## COUNT III

## Violations of the Florida False Claims Act, Fla. Stat. §§ 68.083(2)(a), (b), (c), and (g)

137.     Relator realleges and incorporates paragraphs 1-122 of this Complaint as if fully

set forth herein.

138.     Sunshine, which acts under the direction and control of Centene and with the

assistance of CMC, which provides, operates, and maintains Sunshine's computer systems,

knowingly and/or recklessly submitted numerous false documents to AHCA including: daily

TA1 and 997 file responses to the X12-834 enrollment files; periodic responses to the 834

Reconciliation and 834 Audit files; quarterly and annual ASR Financial Reports certified as true

by Sunshine's CEO, Chris Patterson; and periodic Enrollment Roster reports.

139.     In accordance with the Contract, the various files and reports submitted by

Sunshine function as claims for payment of the specified capitation rates for each enrollee

identified by AHCA and confirmed by Defendants as receiving services.

140.     AHCA relied upon Defendants' numerous false statements and made at least

$13,571,412.72 in capitation payments between December 2018 and May 2019 for 21,816

enrollees who were improperly denied services by Sunshine during December 2018 and at least

through April 2019.

141. The Contract imposes significant sanctions and liquidated damages for any material breach and it contains multiple tables with descriptions of specific events and the corresponding obligation that is incurred.

142. The Contract also requires Sunshine to identify and return any overpayments to AHCA within forty days of discovery. Defendants are likewise subject to the "sixty-day rule" of the Patient Protection and Affordable Care Act.

143. In accordance with the terms of the Contract, AHCA relies upon the various files and reports submitted by Sunshine to determine what, if any, sanctions or liquidated damages should be imposed upon Sunshine.

144. Defendants met numerous times and conspired to submit false files, reports, and other statements to ACHA to obtain additional capitation payments and to avoid Sunshine's obligations under the sanctions and liquidated damages provisions of the Contract.

145. In doing so, Defendants have violated:

   a. Fla. Stat. § 68.082(2)(a) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

   b. Fla. Stat. § 68.082(2)(b) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

   c. Fla. Stat. § 68.082(2)(g) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and/or

35

     d. Fla. Stat. § 68.082(2)(c) by conspiring to commit violations of Fla. Stat. §§ 68.082(2)(a), (b), and (g).

146. Because of the false or fraudulent claims made by Defendants, the State of Florida has suffered and continues to suffer damages and is therefore entitled to recovery as provided by the Florida False Claims Act of an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator Elias Kranidis, on behalf of the United States of America, the State of Florida, and his own behalf, demands and prays that judgment be entered as follows against Defendants for violations of the Federal and Florida False Claims Acts:

(a) In favor of the United States against Defendants for treble the amount of damages to the Medicaid program from the submission of false claims and concealment of obligations incurred by Defendants under the Contract and a civil penalty provided by federal law for each violation of the Federal False Claims Act;

(b) In favor of the State of Florida against Defendants for treble the amount of damages to the Florida Medicaid Program and AHCA from the submission of false claims and concealment of obligations incurred by Defendants under the Contract and a civil penalty provided by state law for each violation of the Florida False Claims Act;

(c) In favor of the Relator for the maximum Relator's share award allowed pursuant to 31 U.S.C. § 3730(d) and Fla. Stat. § 68.085 to include reasonable expenses, attorney's fees, and costs incurred by Relator;

(d) In favor of the Relator for all compensatory and punitive damages, including personal injury damages for pain and suffering and loss of reputation, as well as interest and attorney's fees and costs to which he is entitled pursuant to 31 U.S.C. § 3730(h);

36

(e) For all costs of this civil action;

(f) In favor of the United States of America, the State of Florida, and the Relator for further

relief as this Court deems to be just and equitable.

## DEMAND FOR JURY TRIAL

147. A jury trial is requested for all issues so triable.

Respectfully submitted this 19th day of December, 2019.

Sean Estes
Florida Bar No.: 0055770
sean@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, Florida 33618
Tel.: (813) 375-3700
Fax: (813) 375-3710